ROBERTS, J.
Appellee, Roberto Maal, moves for rehearing en banc with regard to this court’s determination that a valid marriage existed between him and appellant, Kimberly Hall. We grant the motion for rehearing en banc on this issue, withdraw the opinion of the court, Hall v. Maal, 34 Fla. L. Weekly D2152 (Fla. 1st DCA Oct.20, 2009), and substitute the following in its place.
Ms. Hall and Dr. Maal were engaged to be married on March 2, 2002, at Old Christ Church in Pensacola. Leading up to their wedding date, they went through many of the familiar activities of those who intend to marry. They arranged for the church, engaged a minister, sent out invitations, arranged for flowers and a photographer, and attended pre-marital counseling. They attended at least two wedding showers. And, as some couples do, they started to work out a pre-nuptial agreement.
The week before the wedding, the couple was scheduled to go to the office of the county court clerk to get a marriage license. However, on that day, Dr. Maal called Ms. Hall at work and told her that they were not going to be able to get a marriage license because they had not agreed on the pre-nuptial agreement. Ms. *684 Hall was understandably upset by this — all of the arrangements had been made and many of the guests were already in Pensacola for the ceremony. Dr. Maal persuaded her to go ahead with the ceremony, reassuring her that “everything will be alright.” On March 2, 2002, Dr. Maal and Ms. Hall participated in a full wedding ceremony performed by a minister at the church with numerous family members and friends present, complete with attendants, music, and flowers, and followed by a very nice reception. They did this knowing that they had not ever applied for nor received a marriage license.
In the years following the 2002 ceremony, two children were born of the relationship, Dr. Maal referred to Ms. Hall as his “wife,” and she referred to him as her “husband.” The mortgage on the parties’ home referred to them as “husband and wife.” Ms. Hall was referred to as “Mrs. Maal” in her workplace, although she had not legally changed her name. The parties continued to file separate tax returns.
A year after the “marriage” ceremony, the parties appeared before the clerk of the court and applied for and received a marriage license. However, the license was neither solemnized nor returned to the clerk of the court to be made part of the official records of the county.
On April 18, 2006, Ms. Hall filed a petition for dissolution of marriage. Dr. Maal responded by filing an answer and counter-petition to establish paternity, wherein he denied the existence of a valid marital relationship. Ms. Hall then filed a “Motion Requesting Judicial Determination of a Valid Marital Relationship.” The court held a hearing on the motion, finding that a valid marital relationship did not exist.
In this appeal, Hall argues that the trial court erred in ruling that the lack of a marriage license was fatal to the existence of a legally cognizable marriage.
Since 1967, when the Florida legislature abolished common law marriage, there has been only one method of producing a legally cognizable marriage in Florida. See generally §§ 741.01-.212, Fla. Stat. (2002). Persons desiring to be married are required to apply for a marriage license which can be issued by a county court judge or the clerk of the circuit court. See § 741.01, Fla. Stat. (2002). After issuance, a license is valid for 60 days within which time the marriage must be solemnized. See § 741.041, Fla. Stat. (2002). Marriage may be solemnized by ordained clergy, judges, clerks of court, or notaries public. See § 741.07, Fla. Stat. (2002). After solemnization, the officiant shall certify on the license that the marriage has been performed and deliver it, within 10 days, to the clerk or judge that issued it. See § 741.08, Fla. Stat. (2002). The county court judge and the clerk of the circuit court are required to keep a correct record of all licenses issued and of the licenses returned as certified by the officiant. See § 741.09, Fla. Stat. (2002). There are also provisions for proving up a marriage when the certificate is not completed on the marriage license, when the certified license is lost or when death or other cause prevents a certificate from being made. See § 741.10, Fla. Stat. (2002).
Section 741.08, Florida Statutes (2002), provides:
Marriage not to be solemnized without a license. — Before any of the persons named in s. 741.07 shall solemnize any marriage, he or she shall require of the parties a marriage license issued according to the requirements of s. 741.01, and within 10 days after solemnizing the marriage he or she shall make a certificate thereof on the marriage license, and shall transmit the same to the office of the county court judge or *685 clerk of the circuit court from which it issued.
There are two eases which examine this section. The first case, In re: Estate of Litzky, 296 So.2d 638 (Fla. 3d DCA 1974), is indistinguishable from the case before us. Rose Litzky, a/k/a Rose Zyontz, married Isaac Litzky in an Orthodox Jewish ceremony officiated by an Orthodox Rabbi and the couple was issued a “Ksuba,” a Hebrew marriage certificate, by the Rabbi. Mr. Litzky died five months later and Ms. Litzky filed a notice of election to take dower. The court referenced part of section 741.211, which eliminated common law marriage and states, “nothing contained in this section shall affect any marriage which, though otherwise defective, was entered into by the party asserting such marriage in good faith and substantial compliance with this chapter.” Id. at 639 (emphasis added). The court ruled that the parties were never legally married stating:
We are in accord with the able probate judge’s opinion that the law of Florida now provides for only one kind of marriage, one which is entered into by the parties in good faith and in substantial compliance with Chapter 741.

Id.

In Metropolitan Dade County v. Shelton, 375 So.2d 32 (Fla. 4th DCA 1979), a couple who sought to be married applied for a license on a Wednesday. However, because a three-day waiting period applied, the license could not be issued until the following Monday. When the couple informed the deputy clerk of court that the ceremony was scheduled for that Friday, the deputy clerk assured them that it would be legal to perform the ceremony on Friday and have the license issued the following Monday. The deputy clerk went so far as to call the notary to provide assurance of the validity of this procedure. The couple had a marriage ceremony on Friday before the notary and other witnesses and then executed the newly issued marriage license in the office of the clerk of court with the notary and the same witnesses present the following Monday.
The Shelton court, while invited by Dade County to declare that ceremonial marriage without a marriage license results in a valid marriage, ruled more narrowly. In applying the “good faith and substantial compliance” test from section 741.211 first applied in Litzky, the court found that the parties acted in good faith in attempting to comply with the statute because “[b]oth of them intended to enter into a valid marriage and both assumed that the licensing procedure suggested by the clerk was valid.” Id. at 33.[1]
The Fifth District addressed a similar set of facts under Oregon law. In Preure v. Benhadj-Djillali, 15 So.3d 877 (Fla. 5th DCA 2009), the parties participated in a religious ceremony in Oregon, but did not apply for nor obtain a marriage license. Ms. Preure claimed that there was a valid marital relationship, although she admitted that a marriage license is required in Oregon for a lawful marriage to exist. She relied on section 106.150(2) of the Oregon revised statutes, which provided that all marriages not affected by legal impediments that are solemnized in a religious ceremony are valid. However, the court *686 determined that the additional statement in section 106.150(2), which provided that the person presiding over the ceremony shall deliver the marriage license to the county clerk who issued the license, presupposed the existence of a marriage license and that the savings clause relied on by Ms. Preure was inapplicable. Therefore, the court found that there was no valid marital relationship under Oregon law. Thus, a much broader savings clause than the one that exists under section 741.211, Florida Statutes (2002), was held not to apply because an in pari materia reading of the marriage statutes demonstrated that a license was needed to be married.
Floi’ida’s marriage statute must be read in pari materia. Couples who desire to be married must apply for a license. There is a fee for getting a marriage license and that fee is reduced for attending pre-marital counseling. The license is valid for 60 days. The officiant at the ceremony must certify that the marriage was solemnized. The certified marriage license must be returned to the clerk or issuing judge within 10 days and the clerk or judge is required to keep a correct record of certified marriage licenses. Finally, there is a provision by which the marriage may be proved in instances where the license is lost or destroyed. At every turn in Chapter 741, marriages are presupposed to have a license. To depart from the requirement to have a license recreates common-law marriage as abolished by section 741.211.
In the case before us, the parties did not proceed in good faith. “Good faith” is defined as “an honest belief.... Honesty of intention, and freedom from knowledge of circumstances which ought to put the holder on inquiry.... [It] de-scribefs] that state of mind denoting honesty of purpose ... and, generally speaking means being faithful to one’s duty or obligation.” The Fla. Bar v. Jackson, 494 So.2d 206 (Fla.1986) (quoting Black’s Law Dictionary 628-24 (5th ed. 1979)). The testimony in the record demonstrates that both Dr. Maal and Ms. Hall were aware that to become married in Florida they were required to appear before the clerk of the court together and apply for and receive a marriage license. Furthermore, the parties applied for and received a license to marry a year after the ceremony at issue here. That license was neither solemnized nor returned to the clerk to become part of the official records of the county. This subsequent act of applying for a license demonstrates that Dr. Maal and Ms. Hall were well aware that their original wedding ceremony did not produce a marriage under Florida law. Although there is little doubt that Ms. Hall genuinely wanted to be married, she could not have reasonably believed she achieved that aim after engaging in a wedding ceremony in full knowledge that neither she nor Dr. Maal had ever applied for a marriage license. A distinction needs to be made between sincerely desiring to be married and attempting in good faith to go through the steps that will result in a legally cognizable marriage.
The parties were not in substantial compliance with Chapter 741. Whether substantial compliance exists is a fact-based inquiry. However, in order for there to be substantial compliance, there has to be some compliance. Some compliance would, at a minimum, entail the parties applying for and receiving a license.
The dissent compares the lack of a marriage license to an unrecorded deed and points out that failure to record a deed does not make invalid the transfer of land. This analogy would work if Ms. Hall and Dr. Maal had actually received a license, gone through a ceremony, and then failed *687 to return the certified license to the clerk of court. The facts before us are more analogous to a situation in which the parties are in negotiation for the purchase of land and reach agreement on a wide range of the terms of the sale yet cannot reach agreement on one final and material term. Therefore, no deed is executed and no sale is made.
The dissent also relies on the canon of expressio unius est exclusio alterius, reasoning that the legislature has explicitly made invalid same-sex and incestuous marriages and therefore did not intend to make invalid marriages that occur without the benefit of a license. The legislature has clearly provided that same-sex marriages are invalid, stating that they “are not recognized for any purpose in this state.” § 741.212(1), Fla. Stat. (2002). However, with regard to incestuous marriages, the statute provides that people in certain familial relationships “may not marry.” § 741.211, Fla. Stat. (2002). This language prohibits a marriage from occurring rather than nullifying one that has occurred much like the language of section 741.08, which the dissent finds to be merely regulatory.
To the extent that the dissent would hold that a marriage ceremony without a license, coupled with living together and “acting married,” results in a valid marriage, it would recreate a species of common-law marriage in violation of section 741.211, Florida Statutes (2002). If the dissent asserts that Ms. Hall entered a technically defective marriage “in good faith and in substantial compliance” with Chapter 741, the record demonstrates otherwise.
Accordingly, the judgment of the trial court is AFFIRMED.
WOLF, WEBSTER, BENTON, PADOVANO, LEWIS, CLARK, and ROWE, JJ., concur.
WETHERELL, J., concurs in part and dissents in part in an opinion with which HAWKES, C.J., DAVIS and MARSTILLER, JJ., concur.
THOMAS, J., dissents in an opinion with which KAHN, J., concurs.
KAHN, J., dissents in an opinion with which THOMAS, J., concurs.
VAN NORTWICK, J., recused.

. The court in Shelton could have, and perhaps should have, reached the same result by holding that the parties were not in fact married on Friday when they had their marriage ceremony, but became married when they signed the license on Monday before a notary and the required witnesses. "Solemnization” under section 741.08 does not require any particular ceremony or the recitation of any particular words but only that the license is executed before the appropriate persons.